THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. WILLIAM BROWN, Defendant-Appellant.

First District (1st Division)   No. 1—88—2430

Opinion filed May 28, 1991.

838

Randolph N. Stone, Public Defender, of Chicago (Elizabeth Burke and James Reddy, Assistant Public Defenders, of counsel), for appellant.

John O'Malley, State's Attorney, of Chicago (Renee Goldfarb, Joseph Brent, and Tyra H. Taylor, Assistant State's Attorneys, of counsel), for the People.

JUSTICE BUCKLEY delivered the opinion of the court:

Defendant William Brown appeals his conviction and 60-year sentence for two counts of aggravated criminal sexual assault (Ill. Rev. Stat. 1985, ch. 38, par. 12—14(a)(3)) and his conviction and 15-year

concurrent sentence for aggravated kidnapping (Ill. Rev. Stat. 1985, ch. 38, par. 10—2(a)(3)). On appeal, defendant contends that the circuit court committed reversible error in (1) admitting evidence of defendant's other crimes under the *modus operandi* exception, (2) refusing to allow defendant to argue consent in his closing argument, and (3) refusing to instruct the jury on the defense of consent. Defendant also contends that his conviction and sentence for aggravated kidnapping were improper where any detention of complainant was merely incidental to the commission of the underlying sexual assault offense and that his extended 60-year sentence for aggravated criminal sexual assault is excessive.

Complainant testified that in August 1986, she was a 16-year-old high school student on summer vacation working at Burger King and Wendy's fast-food restaurants. On August 6, at 10:30 p.m., complainant completed work and walked towards her "L" station. On the way, she met defendant for the first time, whom she identified in court. She testified that defendant said "hi" to her and she responded "hi." As she continued to walk, defendant followed her and told her that she "looked like an old friend of his that he was in love with." Complainant continued walking and defendant followed her, saying he was "going that way." While waiting for her train, defendant began talking about a clerical job available at Water Tower Place and that he would help her get the job and to write out a resume for the position. Defendant also offered to give her $200 for some nice clothes but complainant declined. As complainant's train approached, the two made arrangements to meet at Wendy's the next day.

At Wendy's the following day, complainant was informed that she needed to accompany defendant to his office to fill out her resume because defendant's papers were located there. The two proceeded by bus to a building which complainant later learned to be the Roosevelt Hotel. Complainant testified that she did not know where she was going and that she never had been to a hotel in her life. Although she had seen hotels on television and in magazines, this hotel did not look like any of those. After entering the hotel, defendant instructed complainant to sit and wait while he went and spoke to the clerk at the desk. Defendant returned and instructed complainant to follow him.

Complainant and defendant then took an elevator to the room where the alleged assault took place. Complainant saw a bed in the room and "whispered" that she did not want to go in there. She entered anyway because defendant was "rushing" her into the room and the elevator operator was standing at the entrance way.

Inside the room, complainant sat down on a chair and defendant on the bed. Defendant talked to complainant until she told defendant that she wanted to start working on the resume. Defendant stated that he first had to ask her the same question that he had asked 26 other girls. Defendant noted that only one of those girls had answered the question correctly and wondered whether complainant would get it right. Defendant asked complainant, "if a dear friend to you did you a favor regardless of what it was, and they asked you to do them a favor, would you do it[?]" Complainant responded, "[I]t depends on what the favor is." Defendant told her she answered the question incorrectly and asked it of her again. Complainant testified, "I started catching on, I say, well, if it has to do with sex, no, and then I got up." She continued, "I was about to walk out of the room. And he said you better sit down before I knock you out." Complainant sat back down and defendant told complainant that if she did not cooperate he was "going to knock you out and take it anyway, so its better if you just take off your dress." Complainant refused, and defendant threatened to knock her out the window. Complainant took off her dress and was told to lie on the bed.

Defendant got on top of complainant and began licking her neck. Complainant requested defendant to stop, but he told her "all I want to do is just lick you all over." Defendant took off complainant's bra and began licking and biting her breast, and then he worked his way down to her vagina. Complainant was crying the whole time and repeatedly told defendant to stop. Defendant told her that he would not get off her until she acted like she was enjoying the assault. He continued biting the victim's vagina and complainant, while crying, pretended like she enjoyed the assault. Defendant next pulled off his pants and put his penis inside complainant's vagina but was unable to get it in all the way because complainant was "real dry" and kept "pushing it out" by moving around. Defendant then tried to stick his penis in her anus but was unsuccessful because complainant continued to move around.

Defendant then got off complainant and handed her a towel to wipe herself. She kept the towel for evidence. After both got dressed, defendant told her "to stop crying because if [she goes] downstairs crying he was going to knock her out." The two proceeded downstairs and walked towards an "L" station together. Defendant gave complainant a "Plain Truth" magazine and wrote a phone number on the back and told her he would meet her the next day in front of Water Tower Place. Complainant went home and immediately took a bath. She called the number on the magazine but nobody at that number

had heard of defendant's name. Complainant then told her mother about the assault and the police were then called. Complainant told one of the officers that she had been sexually assaulted, and the police later took complainant to the hospital.

At the hospital, complainant told the nurse that she believed that defendant had anal intercourse with her because she had a painful bowel movement. The State and defendant stipulated to the testimony of the examining physician, Dr. Thomas Peters. Dr. Peters would testify that complainant told him that she was sexually assaulted and that defendant possibly engaged in anal intercourse with her against her will. The doctor found no signs of trauma and complainant's hymen was still intact. The doctor was unable to complete the vaginal exam because of complainant's great fear.

On December 15, 1986, after defendant was taken into custody, complainant positively identified defendant in a police lineup. Both complainant's mother and the police officer who responded to the call were later called by the State and confirmed that complainant had stated to them that she was sexually assaulted by defendant.

On cross-examination, complainant testified that defendant's briefcase contained "fake" resumes. She admitted that she was "suspicious" of defendant but that he also reminded her of a teacher at school. She stated that she knew Water Tower Place consisted of businesses and was in a wealthy neighborhood. Complainant also admitted that she voluntarily accompanied defendant to the hotel and that, while she did not know she was entering a hotel, she did notice a desk clerk and an elevator operator. Complainant also admitted that she did not mention to the desk clerk or to anyone in the hotel lobby or on the way to the train that she had been sexually assaulted.

Christine Anderson, an expert witness from the Chicago crime laboratory serology unit, testified for the State. She stated that there was no semen present in the vaginal and rectal swabs taken at the hospital. She also stated, however, that a negative result was not uncommon and could be caused by there being no intercourse, no ejaculation, or if the portion of the orifice tested did not contain any semen. She also stated that a bath could wash away any semen.

Over defendant's objection, two women testified to having been similarly assaulted by defendant. J.H. testified first. She stated that on November 4, 1986, she had just finished working at Mrs. Fields Cookies and went to a Burger King restaurant on State Street. While ordering food, a man, whom J.H. identified as defendant, approached her and told her that she looked like a lady named Pamela and that he could get her a clerical job at Water Tower Place. Defendant asked

her whether she would do a favor for someone if that person did a favor for her. J.H. responded that it all depends on the favor. Defendant asked her if she had a resume and told her that he already had one and would make copies for her. She did not know where they were going but was interested in the job because defendant was making the job sound "so good." She took a State Street bus with defendant to the Roosevelt Hotel. She knew what was happening to her was unusual, but she continued with defendant into the hotel. After defendant checked in with the clerk, they proceeded to the room.

Inside the room, J.H. asked defendant about the resume. Defendant said there was no resume. She told defendant that she wished to leave, and defendant said, "[Y]ou ain't going to leave now cause you here now and I want to get what I can." She again asked to go, but defendant threatened that he would hit her. Defendant threatened to hit her three times and told her he wanted to have sex with her. She responded no, but after continued threats, she took off her pants and panties. Defendant gave her a towel to wipe her vagina so he would not catch a disease. J.H. removed her bra upon defendant's request and defendant started licking her breasts and vagina. Defendant then had vaginal intercourse with her. After the incident J.H.'s mother telephoned the police. J.H. positively identified defendant in the police lineup held on December 15, 1986.

On cross-examination, J.H. admitted that she knew where Water Tower Place was and that she and defendant were not riding the bus in that direction. She also admitted seeing the Roosevelt Hotel sign before entering it and that defendant never struck her. She stated that she knew Chicago police headquarters was located around the corner from the hotel but did not go there after the assault or tell anyone what had happened. J.H. admitted telling the police earlier that defendant had forced her off the bus, but on redirect, she testified that she so stated because she felt stupid about how she had acted. J.H. testified that she voluntarily accompanied defendant to the hotel.

I.F. also testified about an encounter with defendant. She testified that on August 11, 1986, she was walking in the Loop when a man, later identified as defendant, approached her and said that she looked like a lady named Pamela that he had just hired at Water Tower Place. He informed her that Plitt Theatres was hiring there and asked if she needed a job. She responded that she did and the two proceeded to a Burger King restaurant. Defendant told her more information about the job and that he would take her to his office, where she could fill out a resume for herself. Defendant continued by

giving I.F. a lady's name who would train her and told her that they would give her money to buy clothes until her first paycheck.

The two left Burger King and went by bus to defendant's office to complete the resume. I.F. did not know where she was going but nevertheless exited the bus and accompanied defendant into the Roosevelt Hotel. Defendant told her it would only take a few minutes to complete her resume and then he would take her to Water Tower Place. She waited for him while he went to the desk clerk. Defendant was wearing a suit and carrying a briefcase. Defendant returned to where she was standing and hurried her to follow him. She resisted at first because she knew it was a hotel, but defendant repeated it would only take a few minutes and questioned her if she really wanted the job. Defendant "grabbed" I.F.'s arm and the two proceeded up to the room by elevator. Inside the elevator, defendant told I.F. how she would get to see free shows and shop all the time.

Once inside the room, she told defendant that she wanted to go. Defendant pushed her on the bed and had his hand on her throat and told her that if she did not cooperate he would kill her. She was crying and screaming, and he told her to shut up. He burnt her back with his cigarette and pulled off her pants while she was kicking him. He told her he had a gun in his briefcase and that if she did not cooperate he would use it. She stopped resisting and defendant began to "bite her vagina and spit blood" on her. She kept crying and screaming and he told her to shut up and that he was going to stick his penis in her. She started screaming again so defendant stopped, got off the bed and pulled up his pants. He told her that if she told anyone he would go to her school and kill her. Both then left the room, and I.F. went to her sister's house. She told her sister what happened and took a bath. The police were called two to three hours later. On December 15, 1986, I.F. saw defendant again while walking down State Street. She ran and got the police and defendant was arrested. Later, at a police station, I.F., complainant and J.H. met for the first time.

On cross-examination, I.F. admitted that she did not tell the doctor about the cigarette burn she received. I.F. responded, however, that she omitted this information because she was more concerned with the other parts of her body. She admitted not telling anyone of the assault until she told her sister.

Officer Patricia Harrison testified for the State that she spoke with the alleged victims and arranged the police lineup. I.F. and complainant were called following defendant's arrest because the assaults followed a pattern and it was suspected that the same defendant committed all of the attacks. On cross-examination, Officer Harrison

stated that no mention of a gun or cigarette burns appears in the initial police report that was prepared regarding I.F. She also explained, however, that a page of the report was lost and, on redirect, she indicated that I.F. had repeated to her in December 1986 that those incidents had occurred.

At the close of the case, the court denied defendant's motion for a consent instruction because the evidence was "devoid of any scintilla of anything" regarding proof of consent. The State nol-prossed two of the eight original aggravated criminal sexual assault charges and the unlawful restraint charge. The jury then found defendant guilty of aggravated criminal sexual assault, criminal sexual assault, aggravated kidnapping and kidnapping. After the court merged many of these counts, it sentenced defendant to an extended term of 60 years on two aggravated criminal sexual assault counts and a 15-year concurrent sentence on the aggravated kidnapping conviction. Because of the sentence defendant received, the State nol-prossed the charges against defendant relating to the sexual assaults on J.H. and I.F. Defendant brings this appeal.

The first issue raised on appeal is whether the circuit court properly admitted the "other crimes" evidence for purposes other than to show defendant's character or propensity to commit crime. Prior to trial, defendant moved *in limine* to exclude the "other crimes" evidence. The circuit court granted this motion but reserved the right to subsequently change its ruling. Later, relying on *People v. Kimbrough* (1985), 138 Ill. App. 3d 481, 485 N.E.2d 1292, and *People v. Fuller* (1983), 117 Ill. App. 3d 1026, 454 N.E.2d 334, the State moved the circuit court to reconsider its prior ruling. Finding the cases presented by the State persuasive, the court ruled that the "other crimes" evidence was admissible. In so doing, the court rejected defendant's contention that *People v. Barbour* (1982), 106 Ill. App. 3d 993, 436 N.E.2d 667, controlled the issue.

■■ ■ Generally, evidence of other crimes is inadmissible if relevant merely to establish the defendant's propensity to commit crime. (*People v. McKibbins* (1983), 96 Ill. 2d 176, 182, 449 N.E.2d 821, 823, *cert. denied* (1983), 464 U.S. 844, 78 L. Ed. 2d 136, 104 S. Ct. 145.) Evidence of the commission of other crimes is admissible, however, when such evidence is relevant to prove any purpose other than propensity to commit crime, such as *modus operandi*, intent, identity, motive, or absence of mistake. (*McKibbins*, 96 Ill. 2d at 182, 449 N.E.2d at 824; see also *Kimbrough*, 138 Ill. App. 3d at 484-85, 485 N.E.2d at 1296.) It is within the sound discretion of the trial court to determine whether evidence of other crimes is relevant to a material

issue and whether the probative value of such evidence outweighs its prejudicial impact; this determination will be overturned only if there exists a clear abuse of discretion. *Fuller*, 117 Ill. App. 3d at 1036, 454 N.E.2d at 342-43.

In resolving the issue relating to the admissibility of the "other crimes" evidence, the circuit court noted an apparent conflict existing within the divisions of the first district as indicated by the decisions in *Barbour, Fuller*, and *Kimbrough*. In *Barbour*, defendant was charged with a sexual assault offense and offered consent as a defense. The State offered the testimony of two other witnesses who testified to being raped by the defendant. On appeal, the appellate court held that the circuit court erred in admitting this testimony under the *modus operandi* exception because the acts lacked sufficient similarity. The court further held that even if sufficient similarity existed, the evidence was inadmissible on relevancy grounds because the identity of the defendant was never in issue as a result of defendant admitting that intercourse took place. (*Barbour*, 106 Ill. App. 3d at 1000, 436 N.E.2d at 672-73.) The court also rejected on relevancy grounds the State's contention that because the two other women testified to having nonconsensual intercourse with defendant, it was then probable that in the instant case the complainant also did not give her consent. *Barbour*, 106 Ill. App. 3d at 1000, 436 N.E.2d at 673.

In *Fuller* and *Kimbrough*, the courts were faced with the same issue as the *Barbour* court faced. In both cases, however, and in contrast with *Barbour*, the courts admitted evidence of other crimes to show *modus operandi* even though identity of the accused was not an issue. These courts reasoned that the relevancy of *modus operandi* evidence is not limited to the identity of the accused, but is also relevant and admissible on the distinct issue of whether a crime was committed at all. (*Fuller*, 117 Ill. App. 3d at 1034, 454 N.E.2d at 341; *Kimbrough*, 138 Ill. App. 3d at 486-87, 484 N.E.2d at 1298.) We note that this latter proposition was first stated by Justice Simon in *People v. Middleton* (1976), 38 Ill. App. 3d 984, 350 N.E.2d 223, and has been frequently repeated by our appellate courts. (See *People v. Clauson* (1989), 182 Ill. App. 3d 268, 537 N.E.2d 1048; *People v. Taylor* (1987), 153 Ill. App. 3d 710, 506 N.E.2d 321; *People v. Burgin* (1979), 74 Ill. App. 3d 58, 392 N.E.2d 251.) Thus, contrary to defendant's assertion, the circuit court properly questioned the persuasiveness of *Barbour* and followed *Fuller* and *Kimbrough* instead. See also M. Graham, Cleary & Graham's Handbook of Illinois Evidence §404.5 (5th ed. 1990).

■ In this case, the similarities between the crime charged and the other crimes were numerous. To name a few, each victim was told about a job at Water Tower Place, each was "tricked" into accompanying defendant to his "office" in order to prepare resumes, each was taken to the Roosevelt Hotel, each was young African-American, and each was molested in similar fashions. Moreover, at least two of the victims were asked the peculiar "favor" question and were offered money for clothes. These similarities establish "a substantial and meaningful link between the offenses being compared" and are "not common to most offenses of that type." (*Clauson*, 182 Ill. App. 3d at 276, 537 N.E.2d at 1053.) Accordingly, the other crimes testimony in this case proved defendant's *modus operandi*, which in turn was relevant to prove defendant's guilt. No abuse of discretion has therefore been shown.

■ The second issue raised by defendant is whether the evidence produced at trial entitled defendant to a jury instruction on the issue of consent and the right to argue consent to the jury during his closing argument. A defendant is entitled to the benefit of any defense shown by the entire evidence, and very slight evidence upon a given theory of a case will justify the giving of an instruction. (*People v. Bratcher* (1976), 63 Ill. 2d 534, 540, 349 N.E.2d 31, 34.) In this case, defendant contends that because complainant's "consent is a current running through the entire record," the court erred in not granting his requested consent instruction. We disagree.

■ Nowhere in complainant's testimony does an inference of consent to the sexual acts arise. Admittedly, complainant voluntarily accompanied defendant to the Roosevelt Hotel and into the hotel room. This voluntary action, however, occurred only as a result of defendant's deceitful scheme which played upon complainant's youth, inexperience and immaturity. Thus, merely because complainant consented to defendant's actions up until the time at which she entered the hotel room with him does not mean that a jury could infer that she consented to the sexual acts which later transpired. Similarly, what transpired after the assault does not give rise to an inference of consent. Complainant testified that after the assault, defendant walked her to the nearby "L" station; that he gave her a telephone number which complainant called when she first got home; and that she did not report the assault to anyone until after unsuccessfully calling this number in an attempt to reach defendant. Again, none of these events gives rise to the inference that complainant consented or approved of what had previously transpired. Finally, as for the sexual acts themselves, the evidence is uncontradicted that complainant's participation

in the acts occurred only after defendant's threatened use of force. Taken together, the evidence as to before, during and after the assault does not even yield slight evidence that complainant consented to defendant's conduct. Therefore, the circuit court properly denied defendant's request for a jury instruction on the issue of consent.

■■ ■ Because no evidence supported the giving of a consent instruction, it follows that the circuit court properly refused to allow defendant to argue consent to the jury during closing argument. All remarks made in closing argument must be based upon evidence presented during trial or reasonable inferences from such evidence. (*People v. Uzelac* (1988), 179 Ill. App. 3d 395, 534 N.E.2d 1250.) Absent slight evidence of consent, the court properly limited the content of defendant's closing argument.

■■ ■ The third issue we address is whether the defendant was properly convicted of aggravated kidnapping in addition to his conviction for aggravated criminal sexual assault. As to this issue, defendant contends that because the detention of complainant was merely incidental to the underlying crime of sexual assault, his conviction for both was improper. This contention, however, ignores the asportation element of defendant's actions and that kidnapping and sexual assault are distinct offenses requiring different elements of proof.

A person commits aggravated kidnapping in Illinois when he commits the crime of kidnapping and, in addition, inflicts great bodily harm or commits another felony upon the victim. (Ill. Rev. Stat. 1985, ch. 38, par. 10—2.) A person commits kidnapping when he knowingly by "deceit or enticement induces another to go from one place to another with intent secretly to confine him against his will." (Ill. Rev. Stat. 1985, ch. 38, par. 10—1(a)(3).) As these definitions indicate, kidnapping can occur, as it did here, in relation to asportation, not merely detention, when such asportation is induced by deceit or enticement and accompanied with the requisite mental state. Moreover, the definition of kidnapping demonstrates that it is totally distinct from the crime of sexual assault. This latter crime requires an act of sexual penetration by the use of force or threat of force. (Ill. Rev. Stat. 1985, ch. 38, par. 12—13(a)(1).) A plain reading of the statutes yields the conclusion that the two crimes are quite different. Accordingly, multiple convictions with concurrent sentences are proper. See *People v. King* (1977), 66 Ill. 2d 551, 363 N.E.2d 838, *cert. denied* (1977), 434 U.S. 894, 54 L. Ed. 2d 181, 98 S. Ct. 273; see also *People v. Casiano* (1991), 212 Ill. App. 3d 680 (kidnapping and aggravated criminal sexual assault are separate offenses).

██ ██ The final issue we address is whether defendant's extended sentence of 60 years for aggravated criminal sexual assault is excessive. A sentence imposed by a trial court will be upheld on review absent an abuse of discretion. (*People v. Palmer* (1989), 188 Ill. App. 3d 414, 545 N.E.2d 743.) We find that no abuse of discretion has been shown.

Defendant was convicted of aggravated criminal sexual assault, a Class X felony. (Ill. Rev. Stat. 1985, ch. 38, par. 12—14(c).) In the absence of aggravating factors, defendant's sentence shall be between 6 and 30 years. (Ill. Rev. Stat. 1985, ch. 38, par. 1005—8—1 (a)(3).) In the presence of aggravating factors, defendant may receive an extended-term sentence of between 30 and 60 years. (Ill. Rev. Stat. 1985, ch. 38, par. 1005—8—2(a)(2).) In this case, the circuit court considered in aggravation the statutory factors that defendant's conduct caused or threatened serious harm, that others need to be deterred from committing similar acts, and that defendant had a history of criminal activity, including a prior Class X felony conviction and a sex offense against minors conviction. (See Ill. Rev. Stat. 1985, ch. 38, pars. 1005—5—3.2(a), (b).) The court also considered the nature of defendant's actions, which it found "distasteful," and the need to protect other members of society from defendant's continuing scheme, which, according to the court, defendant "deftly executed." No mitigating factors were found. Based on the above, no abuse of discretion has been shown. Therefore, we find that the length of defendant's sentence is proper.

Accordingly, for the foregoing reasons, we affirm defendant's conviction and sentence.

Affirmed.

MANNING, P.J., and O'CONNOR, J., concur.