310

THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v.
ROBERT GAINES, Defendant-Appellant.

First District (1st Division)   No. 1—87—1125

Opinion filed September 30, 1991.

Michael J. Pelletier and Gordon H. Berry, both of State Appellate Defender's Office, of Chicago, for appellant.

Cecil A. Partee, State's Attorney, of Chicago (Renee Goldfarb and Tyra H. Taylor, Assistant State's Attorneys, of counsel), for the People.

PRESIDING JUSTICE MANNING delivered the opinion of the court:

Defendant Robert Gaines was charged by indictment with aggravated criminal sexual assault, armed violence, criminal sexual assault, aggravated kidnapping and kidnapping. Prior to defendant's trial he filed a petition to quash arrest and suppress evidence. The court denied that petition.

Defendant's first trial resulted in a "hung jury." He was subsequently tried by a second jury and convicted of two counts of aggravated criminal sexual assault and aggravated kidnapping. (Ill. Rev. Stat. 1985, ch. 38, pars. 10—2(a), 12—14(a)(1), (a)(2).) Defendant was sentenced to serve 15 years in prison for one count of aggravated criminal sexual assault and a concurrent eight years for aggravated kidnapping. Defendant was not sentenced for the second aggravated criminal sexual assault conviction.

On appeal defendant argues that: (1) the trial court erred in denying his petition to quash arrest and suppress evidence; and (2) that under the principle of "one act, one crime," the court improperly sentenced him for both aggravated criminal sexual assault and aggravated kidnapping.

At the evidentiary hearing on defendant's motion to quash arrest and suppress statements, defendant's mother, Rebecca Gaines, testified that about 9 p.m. on September 21, 1985, a Chicago police officer came to her door and asked whether anyone named "Grimes" lived at that address. She replied "no," then the officer asked whether the owner of the car parked in the yard lived at that address. She responded "yes" and sent her grandson to get the defendant. Before defendant reached the open front door, Ms. Gaines advised defendant that the officer wanted to speak with him. Ms. Gaines stated that at the door defendant asked the officer "what is up" and told the officer that he owned the Toyota parked in the yard. The officer then told defendant to "step outside," which he did. Ms. Gaines testified that the officer then immediately suggested that he and defendant step inside in order to avoid "making a scene."

Ms. Gaines testified that defendant and the officer walked inside the house and left through the back door. When defendant stepped outside, there were two policemen there. Ms. Gaines stated that she followed the policemen and defendant outside and into the yard, where the officer searched the interior and trunk of the car. The officer lifted defendant's briefcase and a bottle of liquid detergent from the trunk. Ms. Gaines described her home and stated that a four-foot wire fence enclosed the yard. She did not remember whether the gate to the fence was opened or closed before the police arrived.

Defendant's sister, Karen Gaines, testified that on the evening of the incident she was present at the house when defendant was arrested. She stated that after hearing a voice calling for "Grimes," she walked downstairs where a police officer and Ms. Gaines were talking in the kitchen. Karen went outside the house, where she saw several police officers searching defendant's car. Karen stated that defendant was handcuffed after the officers searched the trunk.

Defendant testified at the hearing on the motion to quash arrest and suppress evidence that about 4 p.m. on September 21, 1985, he was in the basement of his home when his mother called him to come upstairs because the police wanted to see him. Defendant stated that he walked to the front door, asked "what is happening," and the officer told him to "step outside." He went outside, and the officer asked him whether he owned the Toyota parked in the yard and whether his name was "Grimes." He told the officer that he owned the car, but that his name was not "Grimes." He stated that the officer then said "Let's step back into the house. Let's not make a scene." Defendant testified that he and the officers walked out the back door of the house and that one officer asked for the keys to his car.

Officer Curd testified that on the day of the incident, Sergeant Giles informed him that the victim had been sexually assaulted and that the offender drove a beige Toyota with license plate number FTC 552. Giles also gave Curd a description of the offender.

Officer Curd testified further that he went to the address registered to the license plate number, knocked on the door and observed the vehicle described by Giles parked in the yard. Ms. Gaines answered the door, and Curd asked her if she owned the car parked in the yard. Curd testified that Ms. Gaines stated that the car belonged to her son. Curd asked to speak with defendant and explained to Ms. Gaines that he was investigating a sexual assault.

Ms. Gaines sent a child to get defendant, then asked Curd to step inside the house. Curd and Giles entered the house and Curd then asked defendant if his car was parked outside and whether anyone else drove it. Defendant answered "yes" and "no," respectively, then they walked into the backyard where the car was parked. Curd further testified that once in the backyard, Giles asked defendant if they could search the car and defendant replied it was fine with him. After searching the trunk of the car, Curd discovered a bottle of Solo laundry detergent, and defendant was then arrested. Curd stated that he did not have a search or arrest warrant and that defendant willingly gave him the keys to the car. Curd drove defendant's car to the police station after defendant was arrested.

Detective Egan testified that about 9:45 p.m. on September 21, 1985, he advised defendant of his *Miranda* rights in the presence of Officers Vimarco and Peak, and that defendant stated that he understood his rights. Egan interviewed both defendant and the victim. He testified that the victim identified defendant in the lineup, and that following the lineup, he obtained defendant's written consent to search his car, which had been brought to the station. Egan stated that he removed the bottle of Solo detergent from the car.

Sergeant Giles testified at the pretrial hearing that about 45 minutes prior to arriving at defendant's home, he received a flash message that a sexual assault had occurred. The offender was described as a black male, age 26, 5 feet 6 inches and 140 pounds. The message indicated that the offender used a knife and drove a beige Toyota, license plate number FTC 552. He stated that he and another tactical unit responded to the message. The officers drove to defendant's home, displayed their badges to Ms. Gaines, then asked her who owned the Toyota parked in the backyard. Giles stated that Ms. Gaines allowed him and Curd into the house, then called for defendant. Giles testified that when defendant appeared, they asked him if he owned the Toyota in the backyard, and defendant replied "yes." He testified that defendant then voluntarily gave the officers the keys to his car and gave permission for a search. Giles testified further that defendant was not arrested in the house, nor was he handcuffed. He stated that he searched the car and found a bottle of Solo liquid detergent in the trunk then arrested and handcuffed defendant. Defendant was taken to the police station and advised of his *Miranda* rights.

At the conclusion of the evidence on the motion to quash arrest and suppress evidence, the court stated that the burden of proving

the allegations in the petition was on the defendant. The court found that there was no suggestive identification, even though defendant never raised this issue orally or in his petition, and that defendant was properly identified as the offender following a lawful arrest. The court, however, found that any statements which defendant made in the house or evidence seized from the house was inadmissible. The court further found that the Solo detergent seized from defendant's car was admissible because exigent circumstances were present and the officers were in "hot pursuit" of a suspected rapist. The court denied the petition in part and granted it in part.

Defendant's first trial resulted in a "hung jury." At the second trial the victim, J.B., testified that on September 21, 1985, she washed her clothes at a laundromat in the Roseland Plaza. She then packed her clothes along with the Solo detergent at about 7:15 p.m. and walked to a bus stop. Defendant drove by in a four-door beige Toyota and told her his name was "James" and asked her how far she was going. The victim told defendant her name and that she was going to Altgeld Gardens. Defendant offered her a ride and told her that he was also headed to Altgeld Gardens, but initially she declined the offer. However, because it was raining, she eventually accepted the ride with defendant. Defendant placed the victim's clothes and the Solo detergent in the trunk of his car and began driving in a direction not leading to her home. He explained to the victim that he planned to take the expressway to her home instead of the street. Defendant drove to Doty Road, and the victim again asked him where he was going. Defendant stopped the car and instructed the victim to "suck his dick." The victim testified that she refused and defendant pulled out a knife and placed it at her throat. He then drove to a McDonald's parking lot and parked. He unzipped his pants, took out his penis and forced the victim to perform fellatio. Thereafter, defendant placed the knife at the victim's side, forced her to have sexual intercourse and ejaculated in her vagina.

Defendant refused to allow the victim to remove a towel from the trunk to clean herself, but gave her napkins from his glove compartment. She used the napkins and discarded them out the window. Defendant then drove the victim back to Doty Road, removed her clothes from his trunk and left her standing. The victim memorized the license plate number as FTC 552. The victim walked down the street, flagged down a cab and told the driver she had been raped. The cab driver then flagged down a police car.

The victim told the police officers that she had been raped and gave them a description of the offender. She described the offender as a black male, 5 feet 6 inches, 140 pounds, with a mustache and a scar over his right eye. The offender wore dark pants and a leather or vinyl jacket. The victim was taken to a hospital where an examination of her mouth and vagina tested positive for sperm. After the medical examination, she was taken to the police station, where she viewed a lineup. She identified the defendant in the lineup as the offender. Following the lineup, she was taken to the police parking lot, where she identified defendant's car as the one in which the offense was committed, and identified the Solo detergent. The victim also identified defendant at trial.

Rick Roberts, a criminologist with the Chicago police department, testified that the vaginal smear from the victim tested positive for sperm. The napkins found at the crime scene also tested positive for sperm and contained pubic hairs similar to those of the victim.

Detective Egan's trial testimony was substantially similar to his testimony at the hearing on the pretrial motion.

Officer Howard testified that on the day of the incident he was flagged down by a cab driver and the victim. Howard testified that the victim complained that she had been sexually assaulted and gave him a full description of the offender, his car and license plate number. Howard radioed a "flash message" and completed a registration check on the license plate number. The car was jointly registered to defendant and one Ms. Varnado. Howard gave the registration address to Officers Peak and Vimarco.

Officer Peak testified that he and Officers Giles, Curd and McKeaver went to the address they obtained from the license number registration. Peak waited by the south side of defendant's home, where he saw a car in the yard which fit the description given by the victim. Another officer knocked on the front door. Peak testified that about six minutes later defendant and other officers walked to the car. The trunk was opened, and Peak saw a bottle of Solo detergent inside. Peak testified that defendant and his car were driven to the police station. Peak sent McKeaver and Curd back to the crime scene to locate the discarded napkins, which they did.

Officer Curd testified at trial that on the night of September 21, 1985, he went to defendant's home and defendant's mother answered the front door. He asked whether the owner of the car parked in the yard was there and eventually defendant came to the

door. Curd stated that defendant voluntarily walked with him to the car, that the car was searched and a bottle of Solo detergent was discovered in the trunk, but not removed. Defendant was then handcuffed.

Assistant State's Attorney Michael Kelly testified that on the day of the incident he and his partner, LuAnn Rodi, interviewed the victim at the police station. Following the interview, Kelly advised defendant of his *Miranda* rights and interviewed him. Kelly testified that defendant waived his rights and agreed to speak with Kelly and Rodi. Kelly stated that defendant denied all knowledge of the incident and stated that he had watched television on the night of the incident. Kelly stated that he asked defendant what really happened, and defendant said he was ready to tell the truth.

Kelly testified further that defendant told him that he saw the victim waiting for the bus and stopped to ask if she wanted a ride. Eventually the victim accepted his offer and he drove her to a nearby McDonald's parking lot and asked her to have sex with him. When the victim refused he pulled a knife out and forced her mouth onto his penis. Shortly thereafter he forced her to have sexual intercourse. Once they completed this act he gave her napkins which she used then discarded out the window. He drove a short distance, then told her to leave his car. After giving this statement, defendant agreed to sign a written statement.

Defendant's mother, Rebecca Gaines, testified that about 8:30 p.m. on September 21, 1985, two police officers came to her door and asked whether a "Grimes" lived there. She told them "no." The officers then asked whether the owner of the Toyota parked in the yard lived at her address, and she told them "yes" and then sent for defendant. After coming to the door, defendant and the officers walked through the house and out the back door to this car. Ms. Gaines followed them outside and saw the officers search defendant's car trunk and remove a bottle of Solo detergent. She testified that defendant was handcuffed after the trunk was opened.

Defendant's fiancee, Larita Varnado, testified that she and defendant were together all day on September 21, 1985. She claimed that they washed clothes, went shopping and returned home about 2:30 p.m. She testified that they listened to the radio and watched television until 9 p.m. She stated that she heard voices at the back door and went outside, where she saw the police open the trunk, search defendant's car and handcuff him. She also stated that the police picked up the Solo detergent and kept it in their possession. She claimed that she purchased the detergent. She fur-

ther stated that she did not see defendant's mother outside during this time.

Defendant's trial testimony was very similar to his testimony at the pretrial hearing. He further testified that he was interviewed by three persons and a document was placed before him to sign. He stated that he refused to sign it, and that one police officer kicked him in the chest and another hit him in the eye. He claimed that he then signed the paper, but denied ever having made the statements it contained. He alleged that the officers did not conduct a lineup, that no fingerprints or photographs were taken that night, and that he had never seen Detective Egan before the trial. He also claimed that Kelly and Rodi never identified themselves as assistant State's Attorneys, and that he was not advised of his *Miranda* rights.

At the conclusion of the trial, the jury found defendant guilty of two counts of aggravated criminal sexual assault and aggravated kidnapping. The court sentenced defendant to 15 years in prison on only one count of aggravated criminal sexual assault, and an eight-year concurrent term for aggravated kidnapping.

Defendant first argues that the trial court erred in denying his petition to quash arrest and suppress evidence. Specifically, he argues that the police violated *Payton v. New York* (1980), 445 U.S. 573, 63 L. Ed. 2d 639, 100 S. Ct. 1371; that the seizure of evidence from his car trunk was unconstitutional; and that the court erred in placing the burden of persuasion on him.

In *Payton*, the Supreme Court held that the United States Constitution in general prohibits police officers from making warrantless, nonexigent entries into a private residence to make an arrest. However, the fourth amendment does not prohibit officers from entering a home without a warrant if exigent or compelling circumstances justify the entry. (*People v. Foskey* (1990), 136 Ill. 2d 66, 554 N.E.2d 192.) We consider first whether the trial court erred in determining that exigent circumstances existed so as to justify the warrantless arrest.

The trial court here determined that defendant was arrested when he came to the door and made statements without being advised of his *Miranda* rights. The court held that any statements made by defendant while he was in the house, and any evidence seized from inside the house, were inadmissible. However, the court held that the Solo detergent seized from the vehicle was admissible because the officers were in "hot pursuit" of a suspected rapist when they obtained the evidence.

While no list of factors constituting exigent circumstances is exhaustive, the Illinois Supreme Court has set out several factors which may be taken into account in assessing exigency in a particular situation: (1) whether the offense under investigation was recently committed; (2) whether there was any deliberate or unjustifiable delay of the officers during which time a warrant could have been obtained; (3) whether a grave offense is involved, particularly one of violence; (4) whether the suspect was reasonably believed to be armed; (5) whether the police officers were acting upon a clear showing of probable cause; (6) whether there was a likelihood that the suspect would have escaped if not swiftly apprehended; (7) whether there was strong reason to believe that the suspect was on the premises; and (8) whether the police entry, though nonconsensual, was made peaceably. *People v. White* (1987), 117 Ill. 2d 194, 512 N.E.2d 677.

■■ In this case, about 45 minutes after Officer Giles was notified of the assault, he and Officer Curd went to defendant's home. During the interim the officers traced the license plate number given to them by the victim to determine the name and address of the person to whom the car was registered. Officer Curd testified that once he arrived at defendant's home he observed the car described by the victim parked in the yard and was informed that the owner of the car lived there. Curd testified that once defendant came to the door, he asked him to step outside. Defendant then voluntarily took the officers through the house and into the yard where the car was parked.

Although there is conflicting testimony as to whether defendant was outside the home when he talked with the officers, there is no allegation that the officers' entry into the home was the result of force or coercion. The offense committed by defendant was one of violence, and the officers had knowledge that he used a knife in his sexual assault of the victim. Further, defendant used a vehicle in the commission of the offense and it was reasonable to believe that he would flee if not apprehended. Also, the delay between the time that the officers were notified of the assault and the time they arrived at defendant's home was justified, considering that they first traced the license plate number to obtain the name and address of the vehicle's owner. Moreover, the court determined that there was no *Payton* issue because the police did not enter the home to arrest defendant.

In determining whether the police acted reasonably, the court must look to the totality of the circumstances confronting the offi-

cers at the time the entry was made. (*People v. Yates* (1983), 98 Ill. 2d 502, 456 N.E.2d 1369.) The circumstances must militate against delay and justify the officers' decision to proceed without a warrant. (*People v. Abney* (1980), 81 Ill. 2d 159, 407 N.E.2d 543.) The guiding principle in such cases is reasonableness, and each case must be decided on its own facts. *People v. White* (1987), 117 Ill. 2d 194, 512 N.E.2d 677.

In this case, the court properly determined that the police officers had probable cause to arrest defendant. The arresting officers received a "flash message" that a sexual assault had occurred and were given a description of the suspect, as well as the license plate number of the car he drove. The officers were also advised that the suspect committed the assault while using the knife. In *People v. Walls* (1980), 87 Ill. App. 3d 256, 408 N.E.2d 1056, the arresting officers had a general description of the suspect, a description of the car in which the assault took place and the car's license plate number when they arrested the suspect without a warrant. The court held that there was probable cause to arrest even though the car described was not the car in which the defendant was subsequently arrested. *Walls*, 87 Ill. App. 3d at 263.

The instant case presents stronger facts than *Walls*. The officers here had a description of defendant, the car he drove, the license plate number, and saw the car parked at defendant's home. Further, once the officers arrived at defendant's home, defendant came to the door, asked "what's up" and then stepped outside willingly. These facts are similar to *People v. Graves* (1985), 135 Ill. App. 3d 727, 482 N.E.2d 223, where the suspect came to the doorway expecting a friend and not knowing the persons knocking on his door were police officers. The suspect lost the privacy he could have expected inside his home by coming to the door.

Similarly, the instant case is stronger than *Graves*. In this case, defendant came to the door with the knowledge that the police officers were waiting for him. Further, as in *Graves*, there was no improper conduct by law enforcement officers. The court determined that there was probable cause for defendant's arrest, and the court's finding was reasonably supported by the facts.

Defendant's reliance on *Payton v. New York* (1980), 445 U.S. 573, 63 L. Ed. 2d 639, 100 S. Ct. 1321, is misplaced. That case involved the seizure of property without a warrant from a suspect's home when that suspect was not present. Likewise, *Riddick v. New York* (1979), 445 U.S. 930, 63 L. Ed. 2d 639, 100 S. Ct. 1321, is also distinguishable where the suspect did not consent to the arrest-

ing officer's entry into his home, nor did he appear in a public place such as his doorway.

In *People v. Wormack* (1980), 91 Ill. App. 3d 169, 414 N.E.2d 177, the officers forced entry through a locked door. This is distinguishable from the instant case, where the entry was consensual. Also, the offenses in *Wormack* were robbery and burglary, less violent than aggravated criminal sexual assault and aggravated kidnapping. Further, the arrest occurred a day after the crime, and there was no strong probability that the suspect would likely be in the building wherein he was arrested.

For the foregoing reasons, we find that the arrest of defendant did not violate *Payton*.

Defendant also argues that the trial court erred in determining that the admission of the Solo detergent and his confession into evidence was proper. The police must obtain a search warrant prior to searching a motor vehicle, unless the circumstances fall within an exception to the warrant requirement. A search warrant need not be obtained if: (1) the police have probable cause to believe that the vehicle was used in or contains evidence of a crime; (2) the police obtain valid consent to the search; (3) the police search the vehicle incident to a lawful arrest; or (4) the vehicle is lawfully impounded and an inventory search results. *People v. Kelk* (1991), 208 Ill. App. 3d 313, 566 N.E.2d 835.

In this case, the court held that the police officers had probable cause to arrest the defendant. The court reasoned that the victim complained that she had been sexually assaulted and gave a description of the offender and the automobile. She also gave the license plate number of the automobile in which the offense took place. The court further held that no *Payton* issue existed because exigent circumstances were present.

■ We find that the trial court's determination that there was probable cause and that exigent circumstances existed supported defendant's warrantless arrest. The officers went to defendant's home about 45 minutes after the victim complained of the offense. There they saw the vehicle she described parked in the yard. The officers knew that the offense took place in the car and that a bottle of Solo detergent was left inside the trunk by the victim. They also knew that there was a co-owner who could have driven the car away.

Furthermore, where probable cause has been determined, a valid search not incidental to an arrest may be made without a warrant. (*People v. Jones* (1967), 38 Ill. 2d 427, 433, 231 N.E.2d 580.)

In *Jones*, the police chased a vehicle driven by defendant that was used in a burglary. The vehicle crashed and defendant abandoned it. He was later arrested while walking down the highway. The keys fitting the trunk of the vehicle were found on defendant's person, and the trunk searched without a warrant. Fifty suits were found inside the trunk of the vehicle. The court stated that the search of the vehicle's trunk was valid notwithstanding the fact that it was at a time and place remote from where defendant was arrested. *Jones*, 38 Ill. 2d at 434.

In this case, the court determined that the defendant was arrested when he voluntarily presented himself at the front door of his home. The vehicle was subsequently searched when the officers went outside his home. Although no search warrant was obtained and defendant did not consent to a search of the vehicle, the court held that under *People v. Drummond* (1981), 103 Ill. App. 3d 621, 431 N.E.2d 1089, the search was reasonable.

We find that the court's decision was not against the manifest weight of the evidence. Therefore, the court did not err in admitting the Solo detergent into evidence.

Having determined that the trial court properly found that defendant was arrested at the front door of his home, defendant's later statement at the station admitting to the crime was also properly admitted into evidence.

■ Defendant further argues that the trial court improperly placed the burden of persuasion on him. At a hearing on a motion to suppress where a defendant raises the allegation that the search and seizure were unlawful, the burden is on the accused to prove that allegation. (Ill. Rev. Stat. 1987, ch. 38, par. 114—12(b).) The State's burden to proceed forward occurs only when the defendant proves a *prima facie* case supporting his motion. *People v. Burton* (1985), 131 Ill. App. 3d 153, 475 N.E.2d 583.

Defendant's reliance upon *People v. Talley* (1975), 34 Ill. App. 3d 506, 340 N.E.2d 167, is misplaced. In *Talley*, the State failed to meet its burden of going forward after the defendant established his *prima facie* case. Further, the police in *Talley* did not have sufficient evidence to warrant a search, while the officers in the instant case had probable cause to arrest the defendant.

For all the foregoing reasons, we hold that the trial court's decision on defendant's motion to quash arrest and suppress evidence was not manifestly erroneous.

Defendant finally argues that he was improperly convicted on both aggravated criminal sexual assault and aggravated kidnapping.

He asserts that under the doctrine of "one act, one crime," separate verdicts for aggravated criminal sexual assault and aggravated kidnapping were improper.

Following the trial, the jury found defendant guilty of two counts of aggravated criminal sexual assault (use of a dangerous weapon: to wit, a knife, and during the commission of aggravated kidnapping) and a separate offense of aggravated kidnapping. The aggravating factor for the kidnapping charge was that defendant committed aggravated criminal sexual assault. The court sentenced defendant for only one aggravated criminal sexual assault count (use of a deadly weapon) and defendant was also convicted of aggravated kidnapping.

In *People v. Rodarte* (1989), 190 Ill. App. 3d 992, 547 N.E.2d 1256, this court upheld defendant's sentences for four counts of aggravated criminal sexual assault and aggravated battery. In *Rodarte*, the defendant went to the victim's home to rest because he had been drinking. Once inside her bedroom he gagged the victim, tied her hands, then placed his mouth over her breast and inserted his tongue and fingers into the victim's vagina. He later forced the victim to leave the apartment building and pushed her into a garage dumpster. In following the conclusion reached in the Illinois Supreme Court case, *People v. Segara* (1988), 126 Ill. 2d 70, 533 N.E.2d 802, the appellate court held that a defendant who commits mutiple acts of equal value, *i.e.*, Class X felonies, may be prosecuted and convicted for each act.

In a more recent case, *People v. Casiano* (1991), 212 Ill. App. 3d 680, 571 N.E.2d 742, the court held that the defendant was properly convicted of both kidnapping and criminal sexual assault. In that case, the victim waited for a bus and began walking down a Chicago street when the defendant approached her, stuck a sharp object into her back, and forced her to walk with him to his apartment about 1½ blocks away. At knifepoint, he later undressed the victim, raped and sodomized her. The court found that defendant used force to carry the victim from one place to another, with the intent to confine her secretly against her will. Thus, the court convicted defendant of one count of kidnapping. The court also found that defendant committed criminal sexual assault based on the forced sexual intercourse and sodomy. (*Casiano*, 212 Ill. App. 3d at 685.) Further, the criminal sexual assault was aggravated by the kidnapping.

Here, defendant kidnapped the victim, drove her to a parking lot and forced her to perform fellatio. He then, at knifepoint,

forced the victim to have sexual intercourse with him. Aggravated criminal sexual assault and aggravated kidnapping are two distinct offenses requiring different elements of proof. Aggravated criminal sexual assault requires proof of sexual penetration by force and the display, threat of use or the actual use of a dangerous weapon, or bodily harm to the victim. (Ill. Rev. Stat. 1985, ch. 38, pars. 12—14(a)(1), (a)(2).) Aggravated kidnapping occurs when there is a kidnapping and the defendant inflicts either great bodily harm, criminal sexual assault, robbery, or aggravated criminal sexual assault upon the victim. Ill. Rev. Stat. 1985, ch. 38, par. 10—2(a).

In this case, as in *Casiano*, the defendant moved the victim from the street to a parking lot with the intent to secretly confine her against her will. He later engaged in several acts of criminal sexual assault upon the victim while displaying a knife. Each act of rape regardless of how it is committed is punishable, since rape is unlike other offenses in that with each act, the victim's psychological constitution and most intimate part of her being have been violently invaded. (*Rodarte*, 190 Ill. App. 3d at 1003.) Therefore, multiple convictions with concurrent sentences are proper. *People v. Brown* (1991), 214 Ill. App. 3d 836, 574 N.E.2d 190.

Accordingly, the judgment of the circuit court of Cook County is affirmed.

Affirmed.

CAMPBELL and BUCKLEY, JJ., concur.