# Illinois Official Reports

## Appellate Court

---

### *People v. Holmes*, 2019 IL App (1st) 160987

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. ANDRE HOLMES, Defendant-Appellant. |
| District & No. | First District, Second Division<br>Docket No. 1-16-0987 |
| Filed | March 5, 2019 |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 12-CR-15740; the Hon. Timothy Joseph Joyce, Judge, presiding. |
| Judgment | Reversed. |
| Counsel on Appeal | James E. Chadd, Patricia Mysza, and Benjamin Wimmer, of State Appellate Defender's Office, of Chicago, for appellant.<br><br>Kimberly M. Foxx, State's Attorney, of Chicago (Alan J. Spellberg, Matthew Connors, and Mari R. Hatzenbuehler, Assistant State's Attorneys, of counsel), for the People. |
| Panel | JUSTICE HYMAN delivered the judgment of the court, with opinion.<br>Justice Pucinski concurred in the judgment and opinion.<br>Presiding Justice Mason dissented, with opinion. |

¶ 1    Chicago police officer Delgado received information from Sergeant Wilkerson, who received information from an unidentified Chicago Park District security guard, whose source of information was unknown, that a man in Brainerd Park had a gun in his pocket. The man was described as black, about five-and-a-half feet tall, wearing a purple shirt and black jeans. Two or three minutes after talking to Wilkerson, Delgado and his partner saw Andre Holmes, who matched the description. There was nothing inappropriate about Holmes's conduct. Nonetheless, the officers approached Holmes, and Delgado immediately touched the pocket of his jeans. Delgado felt what he recognized as the trigger and trigger guard of a gun. The officers ordered Holmes to the ground, put him in handcuffs, and placed him under arrest.

¶ 2    Holmes now challenges the initial seizure, before his arrest, as an unconstitutional *Terry* stop (*Terry v. Ohio*, 392 U.S. 1 (1968)). He argues that the officers did not have reasonable suspicion to stop him. In particular, both the security guard's identity and the source of information remain unknown, "effectively" an anonymous tip, which, without more, cannot provide a reasonable suspicion of criminal activity. The State responds that the tip was reliable and not anonymous and contained sufficient information to support the *Terry* stop.

¶ 3    The round of "telephone tag" that led to Delgado's decision to stop Holmes does serious damage to the tip's reliability; although, even if the involvement of a "park security guard" alone arguably dissipated the cloud of anonymity, we would still find the tip insufficiently reliable.

¶ 4    In a free society, we should be ever mindful of the danger of anonymous tips. "[Unlawful possession of guns] is a serious matter, but so is the loss of our freedom to come and go as we please without police interference." *Prado Navarette v. California*, 572 U.S. ___, ___, 134 S. Ct. 1683, 1697 (2014) (Scalia, J., dissenting, joined by Ginsburg, Sotomayor, and Kagan, JJ.). Moreover, while hardly proof of anything, anonymous tips can be highly inaccurate, misleading, and motivated by bad intentions, all of which can pose a serious threat to our fourth amendment rights.

¶ 5    We reverse the denial of Holmes's motion to suppress, and since the State will be unable to proceed without evidence of the suppressed gun, Holmes's conviction is reversed outright.

¶ 6                                            Background

¶ 7    On a summer evening in 2012, a crowd of some 1200 people attended an annual picnic in Brainerd Park. Responding to a request for assistance from Sergeant Wilkerson, Chicago police officers Delgado and Montes went to the park. When they arrived, Wilkerson told them that a park security guard had said that a man was in the park with a gun. Wilkerson never said whether the security guard personally observed the man. Wilkerson also did not otherwise identify the security guard or say how much time had elapsed since he had talked to the security guard or provide any information concerning the unidentified man's location in the park. Wilkerson described the man as black, about five-and-a-half feet tall, and wearing a purple shirt with black jeans.

¶ 8    Delgado and Montes then set off walking through the park. About two to three minutes after talking to Wilkerson, they saw Holmes, who matched Wilkerson's description. Holmes was not doing anything visibly illegal. There were no observable bulges in Holmes's pocket.

¶ 9 Both officers walked up to Holmes, and Montes asked Holmes if they could speak with him. While Montes was talking to Holmes, Delgado got closer and touched Holmes's jeans pocket. Delgado felt the trigger and trigger guard of a gun and immediately told Holmes not to move and to get down on the ground. Montes handcuffed Holmes and Delgado recovered a gun from Holmes's pocket, loaded with four rounds of ammunition. The officers arrested Holmes.

¶ 10 So testified both Holmes and Delgado at a hearing on Holmes's pretrial motion to suppress evidence. After Holmes's testimony, the trial court shifted the burden to the State to justify Holmes's detention. Holmes's counsel argued that the evidence had not indicated the source of what Wilkerson had told the officers and, without more, was insufficient a *Terry* stop and frisk.

¶ 11 The State countered that the officers' interaction with Holmes was nothing more than a field interview and, even if a seizure, was reasonable because it did not matter whether the source of Wilkerson's information was identifiable.

¶ 12 The trial court denied Holmes's motion finding that, though based on "an anonymous tip," the officers' actions were reasonable because a sufficient basis existed to stop Holmes. After arguments on Holmes's motion to reconsider, the trial court found that the interaction between Holmes and the officers "was not a *Terry* stop," characterizing it instead as "an encounter between a citizen and police officers." The court, "without giving credibility one way or the other to the tip the officers received" found that the officers could reasonably approach Holmes and ask him some questions based on the information they knew.

¶ 13 The State proceeded to trial on only one count, aggravated unlawful use of a weapon based on Holmes's lack of a Firearm Owners Identification (FOID) card, and the parties adopted Delgado's suppression hearing testimony. The parties also stipulated that, as of the date of Holmes's arrest, he did not have a valid FOID card. The trial court found him guilty and sentenced him to 18 months of felony probation.

¶ 14 Holmes filed a motion for a new trial, reasserting his claim that the trial court had erred by denying his motion to suppress. The trial court denied Holmes's motion.

¶ 15                                                                    Analysis

¶ 16 Holmes argues that the trial court erred when it denied his motion to suppress because the tip provided to the officers was "effectively anonymous" and therefore "insufficient to support reasonable suspicion for the stop and frisk." Holmes asserts that Delgado's frisk of his person constituted a *Terry* stop sufficient to trigger the protections of the fourth amendment and that the tip lacked the requisite legal corroboration to establish reasonable suspicion for a *Terry* stop and frisk. As an alternative argument, Holmes claims that his pat-down was not justified by the so-called "special needs" exception to the fourth amendment. If we find the gun should have been suppressed, Holmes asks us to reverse his conviction outright because the State would not be able to proceed at a new trial.

¶ 17 The State, for its part, no longer disputes the nature of the encounter between Holmes and the officers, agreeing that they conducted a *Terry* stop and frisk. The State argues, however, the tip that led to Holmes's detention came from an identifiable security guard. The State assures us that we can rely on the security guard's tip because it was given in person and security guards are presumptively more trustworthy reporters of crime than ordinary eyewitnesses. The State argues only that the stop was supported by reasonable suspicion based on the security

guard's tip and agrees "the special needs doctrine is not applicable." Naturally, given its position that the stop was reasonable, the State asks us to affirm.

¶ 18    We find the security guard's tip insufficiently reliable. The State's argument depends on multiple assumptions that the record does not support. The State assumes that the security guard provided the tip in person; the record reveals that Delgado did not know how the security guard reported to Sergeant Wilkerson. The State argues that security guards by nature are more reliable eyewitnesses, but we do not know whether the security guard was actually an eyewitness or learned his or her information elsewhere or, for that matter, whether he or she was an experienced or inexperienced security guard. Given all of these unknowns, we agree with Holmes that the tip was "effectively anonymous" and did not support a finding of reasonable suspicion. We reverse the trial court's denial of Holmes's motion to suppress and reverse his conviction outright.

¶ 19    We begin by setting out the foundational principles of law applicable to this type of police-citizen encounter. Broadly speaking, *Terry*, 392 U.S. 1, governs. *Terry* gives officers a "narrowly drawn authority" to detain people and search for weapons where they reasonably believe that "criminal activity may be afoot" and that the person seized "may be armed and presently dangerous." *Id.* at 27, 30. The justifications for the seizure and search are distinct. A seizure, short of an arrest, is justified only where an officer "reasonably suspects that the person apprehended is committing or has committed a criminal offense." *Arizona v. Johnson*, 555 U.S. 323, 326 (2009). Once seized, he or she may only be frisked if an officer "reasonably suspect[s] that the person stopped is armed and dangerous." *Id.* In short, the validity of the initial stop constitutes a necessary precondition to the validity of any later search.

¶ 20    We determine the reasonableness of a *Terry* stop based on the facts known to the officer at the moment the stop occurred. *People v. Thomas*, 198 Ill. 2d 103, 109 (2001). In considering the interaction between a citizen and the police, we accept the facts as found by the trial court unless those findings are manifestly erroneous. *People v. Harris*, 228 Ill. 2d 222, 230 (2008). Applying *de novo* review, we may make our own determinations as to whether the facts justify the challenged seizure as a matter of law. *Id.* at 230.

¶ 21    Officer Delgado's justification for Holmes's seizure relies entirely on information received from Sergeant Wilkerson, which was received from the security guard, who, because the record is silent, may or may not have had firsthand knowledge that a man matching Holmes's description had a gun. While the circumstances are somewhat unusual, the legal framework for evaluating third-party tips has been fairly well-settled.

¶ 22    Informant tips "may vary greatly in their value and reliability." *Adams v. Williams*, 407 U.S. 143, 147 (1972). Cases involving known informants are "stronger case[s]" than those involving anonymous tipsters. *Id.* at 146. In all cases involving tips, anonymous or otherwise, paramount concerns involve the informant's "veracity, reliability, and basis of knowledge." (Internal quotation marks omitted.) *Alabama v. White*, 496 U.S. 325, 328 (1990). An anonymous tip, without more, generally provides "virtually nothing" by which one could conclude that the tipster is honest, that his or her information is reliable, or that he or she has a basis by which to predict a suspect's criminal activity. *Id.* at 329.

¶ 23    These principles collided in *Florida v. J.L.*, 529 U.S. 266, 270-71 (2000) (discussing *Williams* and *White*). In *J.L.*, an unknown tipster called and alleged that a young black man was standing at a bus stop, wearing a plaid shirt, and carrying a gun. *Id.* at 268. When officers arrived at the bus stop, they saw J.L. wearing a plaid shirt, but they did not see him do anything

illegal, they did not see a firearm, and he made no furtive movements. *Id.* The court found the anonymous tip unreliable because there had been no predictive information given, so the officers were unable to judge the informant's knowledge or credibility. *Id.* at 271. Moreover, the tipster had not explained how he or she knew about the gun and provided no information to suggest inside knowledge. *Id.* It did not matter that the tip turned out to be correct because the officers did not have reasonable suspicion of criminal activity before the stop. *Id.*

¶ 24   *J.L.* also rejected two arguments pressed by the government. First, the court noted that it was unremarkable that a tip was able to provide accurate information about "location and appearance." *Id.* at 272. These features are readily observable by anyone and, in any event, do not provide the reasonable suspicion of *criminal* activity necessary to support a *Terry* stop. *Id.* Second, the court declined to adopt a "firearm exception" to *Terry*. *Id.* Recognizing the danger of guns, the court said that any such rule would "enable any person seeking to harass another to set in motion an intrusive, embarrassing police search of the targeted person simply by placing an anonymous call falsely reporting the target's unlawful carriage of a gun." *Id.* The fourth amendment "is not so easily satisfied." *Id.* at 273.

¶ 25   Most recently, the Supreme Court addressed the issue of anonymous tips in *Prado Navarette*, 572 U.S. ___, 134 S. Ct. 1683. There, a 911 caller reported that another car ran her off the road. *Id.* at ___, 134 S. Ct. at 1686. She provided the make, model, license plate number, the mile marker, and the direction of travel. *Id.* at ___, 134 S. Ct. at 1686-87. About 15 minutes later, an officer saw the car and pulled it over. *Id.* at ___, 134 S. Ct. at 1687. The court, assuming the 911 caller was anonymous, found that the details in the call provided evidence that the caller had firsthand knowledge of the incident, thereby distinguishing the case from *J.L. Id.* at ___, 134 S. Ct. at 1689. The court also found reliability based on the officers' observation of the car, suggesting the tipster reported the incident contemporaneously with its occurrence. *Id.* at ___, 134 S. Ct. at 1689. Finally, the court found the tip reliable because the caller exposed herself to identification, and therefore accountability, by using the 911 system. *Id.* at ___, 134 S. Ct. at 1689-90. Nevertheless, *Prado Navarette* was a self-described " 'close case.' " *Id.* at ___, 134 S. Ct. at 1692.

¶ 26   Only one case in Illinois, *People v. Lopez*, 2018 IL App (1st) 153331, has analyzed *Prado Navarette*, and we find its analysis applicable and persuasive as to Holmes's detention.

¶ 27   In *Lopez,* the arresting police officer received information from another officer about " 'a DUI driver' " in a black Ford Expedition with a partial license plate number of "NZ 1." *Id.* ¶ 4. The Expedition was being driven by " 'a male Hispanic.' " *Id.* The arresting officer did not know the identity of the person who reported the drunk driver and did not know how much time had passed from the initial report to the traffic stop. *Id.* The officer found a black Expedition with a plate beginning with "N 211." *Id.* ¶ 5. The Expedition did not commit any traffic violations. *Id.* Once the arresting officer turned on his emergency lights, the Expedition immediately pulled over. *Id.*

¶ 28   Relying on *Prado Navarette*, the court in *Lopez* found that the arresting officer lacked sufficient information for the stop. The court found that, unlike *Prado Navarette*, no information indicated what the original tipster had witnessed to support a conclusion that the driver of the Expedition was drunk. *Id.* ¶ 21. Also, unlike *Prado Navarette*, no information indicated that the tipster gave a name or contacted the police through an emergency number. *Id.* ¶ 22. So, the court found, "where there is no evidence that the tipster gave a name or contacted the police through an emergency number, 'the tip must be treated as an anonymous

one, and its reliability hinges on the existence of corroborative details observed by the police.' " *Id.* (quoting *People v. Smulik*, 2012 IL App (2d) 110110, ¶ 8). Looking then to *J.L.*, the court concluded that the only details confirmed by the arresting officer were the location, direction, make, color, and partial plate of the Expedition. *Id.* ¶ 23. That information was not enough to confirm any allegation of illegality. *Id.*

¶ 29    In every legally relevant respect, the tip on which Delgado and Montes relied is strikingly similar to the tip in *Lopez*. Just as the officer in *Lopez*, Delgado received his tip from another officer. While Sergeant Wilkerson told Delgado that he received information about a man with a gun from a park security guard, just as in *Lopez*, no testimony identified the ultimate source of the information that the first officer received. There is nothing in the record to indicate whether the guard personally observed the gun possession or if the guard received the information from somebody else. Just as the officer in *Lopez*, Delgado was told a general description of Holmes's appearance and that he was somewhere in the park. Finally, just as the officer in *Lopez*, Delgado confirmed that Holmes matched the general description but did not notice Holmes doing anything illegal when he saw him. Like the court in *Lopez*, we find the tip less reliable than the "close case" in *Prado Navarette*.

¶ 30    The State makes several arguments in support of the reliability of the security guard's tip, which may have some surface appeal but once examined are all flawed. The State argues that informants who provide tips in person are more reliable than those who provide information over the phone. We have no quarrel with that proposition, as there are ample cases in Illinois supporting it. *E.g.*, *People v. Miller*, 355 Ill. App. 3d 898, 903 (2005) (citing *In re A.V.*, 336 Ill. App. 3d 140, 144 (2002)). But, we have no idea whether the security guard provided the information to Sergeant Wilkerson in person because Delgado did not know and he was the only officer to testify. Even if we were to indulge in speculation that the security guard gave Wilkerson the tip in person, cases like *Miller* and *A.V.* are distinguishable.

¶ 31    In *Miller*, police received an in-person tip from a source who personally saw the defendant carrying a gun. *Id.* at 899. The officers then drove only one-eighth of a mile to where they observed the defendant, allowing the court to infer that the informant "could have been traced" because he likely would have still been near the scene. *Id.* at 903-04. Similarly, in *A.V.*, the tipster approached police and told them a kid was showing a gun to other young people in a park. 336 Ill. App. 3d at 141. Five or six others and the officer corroborated the information. *Id.* The court found that the information was conveyed timely; the officers found the respondent within one minute of the tip and did not travel far. *Id.* at 144. The court inferred that the tipsters remained in the park and "could be found and held accountable." *Id.*

¶ 32    The tip from the security guard differs markedly from the tip in both *Miller* and *A.V.* Even if the guard made his or her report in person and from the park, unlike *Miller* and *A.V.*, we do not know whether the guard personally observed the allegedly illegal activity. Additionally, we do not know the amount of time that elapsed between the tip and Holmes's detention. We know that two to three minutes passed from the time Delgado talked to Wilkerson, but we do not know how long before that the security guard spoke with Wilkerson. We therefore cannot infer that the security guard had personal knowledge of the claimed illegal activity or that the guard could have been tracked down as easily as the tipsters in *Miller* and *A.V.* had the information turned out false.

¶ 33    The State also argues, citing *United States v. Robinson*, 670 F.3d 874, 876-77 (8th Cir. 2012), that "security guards [are] especially reliable tipsters in the context of assessing the

reasonableness of a police officer's suspicion." The Eighth Circuit's decision makes that point, but the genesis of its holding warrants more analysis than the State provides. The case that the Eighth Circuit relies on for this principle comes out of the Seventh Circuit. *Id.* at 876 (citing *Gramenos v. Jewel Cos.*, 797 F.2d 432 (7th Cir. 1986)). There, the court engaged in an extensive discussion about the reliability of *eyewitnesses* and concluded that a security guard, who personally observed a suspected crime, "is not just any eyewitness." *Gramenos*, 797 F.3d at 439. Security guards in these circumstances face institutional pressures to err on the side of caution before accusing patrons of their establishments of criminal wrongdoing. *Id.*

¶ 34     We cannot apply the Seventh and Eighth Circuits' endorsement of security guard tips to Holmes's detention. We do not know whether or not the security guard who reported to Sergeant Wilkerson personally observed the gun possession. Nothing in the record explains the source of the security guard's information. As a result, we cannot say that the security guard was an "eyewitness." For that reason, the institutional pressures that bear on security guards to avoid falsely implicating someone do not apply. For example, a guard who hears of some criminal activity from another source does not bear personal responsibility for the error if the source turns out to be wrong. He or she can simply pass on the blame for the incorrect information to the unknown source. So, unlike the eyewitness security guard in *Robinson*, there is no corporate or institutional "self-interest" weighing on the guard who simply passes on information he or she learned from another.

¶ 35     All of this discussion about the reliability of security guard tips assumes that Sergeant Wilkerson made personal contact with the security guard, which the record does not answer. During the suppression hearing, defense counsel and Delgado engaged in this exchange:

> "Q. Did Sergeant Wilkerson indicate to you whether or not he met with his park security or the security officer called him on his phone?
>
> A. That I don't know.
>
> Q. Did the security officer say where my client got this gun from?
>
> [STATE]: Objection: Relevance.
>
> [THE COURT]: Overruled.
>
> A. I have no idea if he told him whether he saw it or where he was or if he called."

Delgado's testimony does not establish, and we cannot assume, that Wilkerson confirmed for himself the identity of the security guard. Furthermore, assuming the security guard got a tip from a concerned citizen, the testimony does not establish whether the security guard received it from a citizen in person or by phone. Notably, Delgado's testimony was offered by the State *after* the trial court had shifted the burden to the State to justify Holmes's detention. See *People v. Brooks*, 2017 IL 121413, ¶ 22 (burden shifts to State to justify intrusion after defendant makes *prima facie* showing that evidence was obtained by illegal seizure). We see no reason for the State not to have called the park security guard, if he or she is as identifiable as the State purports, to give a firsthand account.

¶ 36     As a final argument, the State asks us to find the tip reliable because Wilkerson's description—a black man, 5 feet, 6 inches to 5 feet, 8 inches tall, wearing a purple shirt and black jeans—was more specific than the description in *J.L.* See 529 U.S. at 268 ("a young black male standing at a particular bus stop and wearing a plaid shirt"). So what. We fail to see any indication in *J.L.* that the outcome would have differed had the tipster been able to describe J.L.'s height. *J.L.* expressly rejected location and physical appearance as sufficient indicators

of the most important fact necessary for a *Terry* stop: suspicion of criminal activity. *Id.* at 272 ("The reasonable suspicion here at issue requires that a tip be reliable in its assertion of illegality, not just in its tendency to identify a determinate person."). Officer Delgado testified that he did not observe Holmes engage in any illegal activity before stopping him; in other words, the officers were able to confirm no more than a general description. See also *Lopez*, 2018 IL App (1st) 153331, ¶ 23 (applying this principle from *J.L.*).

¶ 37    The United States Supreme Court described its decision in *Prado Navarette* as a " 'close case.' " 572 U.S. at ___, 134 S. Ct. at 1692. While the officers there were confronted with an anonymous tip, there were a lot of things that the officers did know. They knew that the tipster personally observed the alleged illegality, they confirmed the details in the tip a demonstrably short time after receiving it, and they knew that the tipster called in on the 911 system, allowing for the call to be traced. *Id.* at ___, 134 S. Ct. at 1689-90. If that case was "close," ours presents too many unknowns to reasonably conclude that the tip was reliable enough to support a *Terry* stop. We do not know the name or have a description of the security guard. We do not know how the security guard reported the information to Sergeant Wilkerson. For that matter, we do not know how the security guard came across the information in the first place, whether he or she personally observed the gun possession or whether it was reported by another source.

¶ 38    Similarly, while we know that it was only two to three minutes from the time Wilkerson told Delgado and Montes about the man with a gun to the time that Holmes was stopped, we have no idea how long it took from the time of the original observation of the man with the gun to the time Wilkenson was told. The fourth amendment "is not so easily satisfied." *J.L.*, 529 U.S. at 273.

¶ 39                                    Responses to the Dissent

¶ 40    We, as well as the dissent, are rightly concerned about the scourge of gun violence in Cook County. But that does not diminish or abrogate the protections afforded under the fourth amendment. An all's-well-that-ends-well approach, one that excuses an unconstitutional seizure because it turns up illegal activity, violates bedrock fourth amendment principles. See *Wong Sun v. United States*, 371 U.S. 471, 484 (1963) (noting Court has "consistently rejected" proposition "that a search unlawful at its inception may be validated by what turns up"); see also *United States v. Shrum*, 908 F.3d 1219, 1232 (10th Cir. 2018) ("Fourth Amendment seizure unlawful at its inception does not change character from its success" (internal quotation marks omitted)).

¶ 41    The dissent first insists that Holmes has invented a novel theory on appeal because, instead of saying that the security guard was an anonymous source, he argues on appeal that it is possible that an unidentified third party served as the source of information. On close examination of the record and Holmes's briefs, before the trial court and before us, Holmes has urged the same theories in form and in substance. In the trial court and here, Holmes insists the tip from the security guard, while not anonymous in a literal sense, lacks reliability due to the absence of testimony about the ultimate source of information.

¶ 42    In the trial court, defense counsel argued that "we have to classify this source of information as anonymous" because "[w]e don't have anyone or somebody identifying themselves as the security guard" and nothing indicates when the security guard found out, whether Wilkerson met with the guard, or how the guard conveyed information to Wilkerson. Then, in counsel's motion to reconsider the denial of the suppression motion, counsel

acknowledged that the tip was not literally anonymous but argued that even tips from known citizen informants must be determined by factors including whether the tip was relayed to the police officer in person and whether the person providing the tip personally observed the illegal activity. Counsel then repeated the arguments from the motion hearing, explaining that nothing is known about the nature of Wilkerson's interaction with the security guard.

¶ 43 Holmes makes the same argument in his appellate briefs—the tip the police officers received was "effectively anonymous" because the State "offered no witness, police officer or otherwise, who knew where the tip had ultimately originated."

¶ 44 In a brief corollary to its point about things that Holmes has or has not argued, the dissent suggests that Holmes conceded at oral argument that if the source of the information was the security guard, the police would have been justified in their conduct. We presume that the dissent is referring to counsel's statement: "If the tip originated with the security guard, *and wasn't just relayed by the security guard*, then it wouldn't be an anonymous tip *** and Mr. Holmes concedes, that *if the record established that*, that would be sufficient to establish reasonable suspicion." (Emphases added.) We do not in any way consider this a concession. Counsel hypothetically addressed what would have been sufficient for a finding of a reliable tip—knowledge about the ultimate source of the information. Nowhere in counsel's statement, or in the surrounding argument, did counsel concede that the record actually *established* that the tip originated with the security guard. And, besides, an isolated statement contrary to everything counsel said in the remainder of his argument and in his briefs does not amount to a concession. See *People v. Colyar*, 2013 IL 111835, ¶ 92 (Burke, J., dissenting, joined by Freeman, J.) ("I take it as a given that contradictory statements made by an attorney cannot form the basis of a binding concession, particularly in a criminal case.").

¶ 45 The dissent next places the burden on Holmes to show the reliability of the tip, despite the trial court's decision to shift the burden to the State. The dissent repeatedly states, "once the State identified the *** source of the information, the State's burden of production was satisfied." *Infra* ¶ 67. It goes on to say, "All the State had to show in the trial court was that the source of the tip was not anonymous," and that "once the State identified the security guard as the source of the information" it was Holmes's burden to fill in any evidentiary gaps. *Infra* ¶¶ 70-71. This argument relies on a faulty premise, namely that the State had actually identified the security guard as the source of the information.

¶ 46 Here it is important to distinguish between two related, but distinct, sources of information. The dissent focuses on the source of Wilkerson's information and, contrary to its implication (*infra* ¶ 67), we never have disputed that Delgado could rely on what Wilkerson told him. Absent Wilkerson's testimony, however, we must take Delgado's testimony about what Wilkerson did and did not tell him at face value. According to Delgado, Wilkerson did not relay important information such as how or when the security guard contacted him or whether the security guard said they personally observed the illegal activity. Delgado can rely on Wilkerson to relay information, but the information that Wilkerson himself possessed must have been enough to establish reasonable suspicion. See *United States v. Hensley*, 469 U.S. 221, 231 (1985) ("[W]hen evidence is uncovered during a search incident to arrest in reliance merely on a flyer or bulletin, its admissibility turns on whether the officers who *issued* the flyer possessed probable cause to make the arrest." (Internal quotation marks omitted.)). Wilkerson certainly knew that *his* source was the security guard, but that provides no safe harbor or justification for the stop.

¶ 47　　　Instead, we must concern ourselves with the security guard and his or her source of information. See *People v. Lawson*, 298 Ill. App. 3d 997, 1001 (1998). The application of this principle to this case is straightforward. Delgado was entitled to rely on Wilkerson, who was in turn entitled to rely on the security guard, but only if the security guard him or herself had sufficient information to justify the *Terry* stop. Notably, every case that *Lawson* cites places the burden on the State to provide that information. *Id.* at 1001-02 (collecting cases). So, the "lack of clarity in the transcript" and "lack of *** evidence in the record" (*infra* ¶ 67) is not only proper to consider, it is dispositive.

¶ 48　　　Here, as we have discussed, we have no information about whether the security guard personally observed the possession of the gun in the park or whether that information was conveyed by someone else; in other words, we have no information to show that the security guard was actually the "source" of the tip.

¶ 49　　　We may know where Wilkerson got his information, but the identity of the ultimate source of the tip—which was undisputedly the State's burden to provide—remains a mystery. The State decided to attempt to satisfy its burden by calling a witness two-steps removed from the purported "source." According to the dissent's own interpretation of the applicable burden in litigation of a suppression motion, the State has not satisfied theirs.

¶ 50　　　Turning to the merits, the dissent relies on *A.V.*, 336 Ill. App. 3d 140, and, to a lesser extent, *Miller*, 355 Ill. App. 3d 898. The dissent also attempts to distinguish *J.L.* and *Lopez*, purely on the basis that the informants were anonymous in the literal sense. We do not find this distinction persuasive because, as we already have discussed, the tip provided to Wilkerson was effectively anonymous. We similarly find each case that the dissent relies on distinguishable.

¶ 51　　　We have already distinguished *Miller* and *A.V.* (*supra* ¶¶ 31-32), and we adhere to those distinctions. In *Miller*, the court could infer a short time from observation of the illegal activity to detention because the officers only had to travel one-eighth of a mile from where they received the tip to where they found the defendant. 355 Ill. App. 3d at 903. The tip provided to officers in *A.V.* was corroborated by other individuals and confirmed "within one minute" of the officers receiving the tip. 336 Ill. App. 3d at 144. By contrast, no witness confirms the information originally given to Wilkerson. More importantly, nothing indicates "how quickly" (*infra* ¶ 74) the officers confirmed the tip.

¶ 52　　　We know officers found Holmes about two minutes after one of them spoke to Wilkerson, but we have no idea when the tip was made to Wilkerson. We do not mean to imply that Wilkerson would have dawdled in his report of the tip (*infra* ¶ 74); we simply add this unknown to the long list that we already have, including our lack of knowledge about when the tipster received or observed the information that was the subject of the tip. In sum, we have no idea how soon the officers encountered Holmes after the initial observation (by whomever it was made) of the reported illegal activity.

¶ 53　　　The dissent also relies on *A.V.* to point out that none of the witnesses "had actually seen or told the police officer he had seen" the alleged illegal activity. *Infra* ¶ 75. It is not just us who believe that personal observation by the purported source is "critical to the analysis." *Infra* ¶ 75. The United States Supreme Court has said that a tipster who "claimed eyewitness knowledge" provided "significant support to the tip's reliability." *Prado Navarette*, 572 U.S. at ___, 134 S. Ct. at 1689. Notably, *Miller* and *A.V.* were decided before *Prado Navarette*. So far, the only Illinois case to rely on *Prado Navarette* since it was decided distinguished it

- 10 -

because there were "no specific allegations as to what the tipster witnessed or had particular knowledge of." *Lopez*, 2018 IL App (1st) 153331, ¶ 21. We are confronted with a similar distinction—there is no information in this record to determine whether the tipster (the security guard) personally observed the alleged illegality.

¶ 54 The dissent's reliance on *In re J.J.*, 183 Ill. App. 3d 381 (1989), is unpersuasive for similar reasons. First, *J.J.* is factually distinguishable. As the dissent itself acknowledges, the security guard in *J.J.* did not personally observe the respondent's gun possession but *was* able to identify the person who had told him about it. 183 Ill. App. 3d at 383. Here we know nothing about the basis of the security guard's knowledge. Additionally, in *J.J.*, how the security guard had reported the tip—via a call to the Elgin police department—was known. *Id.* Notably, the call itself was played for the court at the suppression hearing, allowing the court to directly evaluate the purported tipster's credibility. *Id.* Again, we have no information about the manner in which the report was made to Sergeant Wilkerson and the security guard was not called to testify; so, directly evaluating their credibility is not possible.

¶ 55 Second, and more significantly, *J.J.*'s value as precedent has been drastically diminished by the passage of time and intervening decisions from the United States Supreme Court. *J.J.* was decided in 1989 and, as a result, could only rely on *Williams*, 407 U.S. 143 (see *supra* ¶ 22), as the leading case discussing *Terry* stops based on tips. See *J.J.*, 183 Ill. App. 3d at 385-89 (discussing *Williams* extensively). In the time between *J.J.* and this case, the Supreme Court decided *White*, *J.L.*, and *Prado Navarette*, as we have discussed. Those cases provided more guidance, adding nuance to evaluating the reliability of third-party tips. We need not go through the particulars again, but we find that *Lopez* is the best contemporary example in Illinois of proper application of the *Williams-White-J.L.-Prado Navarette* line of cases.

¶ 56 A final note about the dissent's citation to *J.J.* We do not disagree with the proposition that we are to review the facts before us from the perspective of a reasonable officer at the time he or she was required to act. But, we are not confronted with an unreasonable response to known facts; we are confronted with the complete absence of facts. We cannot confirm the reliability of the tip the officers received because there is too much that we do not know about it. We do not reverse Holmes's conviction as a criticism of the officers. We reverse because the State failed to meet its burden to identify the source of the tip—despite its repeated claims that the security guard, who could confirm the source, would be easy to find—rendering the tip's reliability irrecoverably suspect.

¶ 57                                                   Conclusion

¶ 58 We find that Holmes's seizure was unlawful, having been based on a factually insufficient and unreliable tip. As we find insufficient facts to justify Holmes's detention, we need not consider whether the subsequent frisk was independently justified. See *Johnson*, 198 Ill. 2d at 109.

¶ 59 We reverse the trial court's denial of Holmes's motion to suppress evidence. Because the State will be unable to proceed without evidence of the gun on remand, we reverse Holmes's conviction outright. See *Lopez*, 2018 IL App (1st) 153331, ¶ 38.

¶ 60 Reversed.

¶ 61        PRESIDING JUSTICE MASON, dissenting:

¶ 62        The Illinois legislature has declared that certain public places are sensitive locations where no citizen has a right to carry a weapon. Among those locations are schools, churches, hospitals, courthouses, and pertinent here, public parks. 720 ILCS 5/24-1(a)(10), (c)(1.5) (West 2012); *People v. Bell*, 2018 IL App (1st) 153373, ¶¶ 29-30; see also 430 ILCS 66/65(a)(13) (West 2016). The havoc wreaked by individuals intent on bringing weapons into such locations is all too familiar, and tragically, the senseless killings that have occurred in recent memory are too numerous to list. See, *e.g.*, Jeremy Gorner, *Gunman in Mercy Hospital Shooting Fired About 40 Shots Before Dying in Shootout With SWAT Officer*, Chi. Trib. (Nov. 21, 2018, 8:15 p.m.), https://www.chicagotribune.com/news/local/breaking/ct-met-chicago-mercy-hospital-shooting-details-20181121-story.html [https://perma.cc/AF55-AMJB]; Campbell Robertson, Christopher Mele & Sabrina Tavernise, *11 Killed in Synagogue Massacre; Suspect Charged With 29 Counts*, N.Y. Times (Oct. 27, 2018), https://www.nytimes.com/2018/10/27/us/active-shooter-pittsburgh-synagogue-shooting.html [https://perma.cc/5X99-5RG6]; Elizabeth Chuck, Alex Johnson & Corky Siemaszko, *17 Killed in Mass Shooting at High School in Parkland, Florida*, NBC News (Feb. 14, 2018, 2:18 p.m.), https://www.nbcnews.com/news/us-news/police-respond-shooting-parkland-florida-high-school-n848101 [https://perma.cc/5REN-QDMR]. Although our supreme court, following the lead of the United States Supreme Court, has declared unconstitutional sweeping restrictions upon an individual's right to carry firearms in public (*People v. Chairez*, 2018 IL 121417; *People v. Aguilar*, 2013 IL 112116), no court has ever questioned a state's ability to prohibit completely the possession of firearms within designated sensitive areas even by individuals possessing valid FOID cards or concealed carry licenses.

¶ 63        On August 12, 2012, during the Annual Grand Picnic in Brainerd Park where 1200 people, including children, were present, Holmes decided to bring a weapon into the park, conduct that no citizen has a right to engage in and that the second amendment does not protect. See *Chairez*, 2018 IL 121417, ¶ 62 (discussing the difference between possessing a gun "in" and "around" sensitive places); *People v. Green*, 2018 IL App (1st) 143874, ¶ 23 (same). Within two minutes of receiving information from a security guard that a man matching Holmes's description was seen with a gun in his pocket, police, acting swiftly and responsibly, located Holmes, patted his front pocket, and retrieved the gun. The majority concludes the trial court should have suppressed that evidence because police did not have a reasonable, articulable suspicion that Holmes was engaging or about to engage in criminal activity when they conducted a *Terry* stop (*Terry v. Ohio*, 392 U.S. 1 (1968)). But the legislature has declared that Holmes's very presence in the park while armed was a crime. 720 ILCS 5/24-1(a)(10), (c)(1.5) (West 2012). And, beyond that, the State provided ample evidence to justify the minimally intrusive search given the quantum of information police possessed. Because the majority's rationale is legally unsound and, if accepted, poses an incalculable threat to public safety, I respectfully dissent.

¶ 64        The touchstone of any fourth amendment analysis is reasonableness. The fourth amendment guarantees the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, *** and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. Const., amend. IV. Illinois courts interpret the search and seizure clause of the Illinois Constitution in conformity with the

Supreme Court's interpretation of the fourth amendment. *People v. Burns*, 2016 IL 118973, ¶ 19; *People v. Fitzpatrick*, 2013 IL 113449, ¶ 15; *People v. Caballes*, 221 Ill. 2d 282, 316 (2006); *People v. Lampitok*, 207 Ill. 2d 231, 240-41 (2003); see Ill. Const. 1970, art. I, § 6 ("The people shall have the right to be secure in their persons, houses, papers and other possessions against unreasonable searches, seizures, invasions of privacy or interceptions of communications by eavesdropping devices or other means. No warrant shall issue without probable cause, supported by affidavit particularly describing the place to be searched and the persons or things to be seized."). The underlying purpose of the fourth amendment is to impose a reasonableness standard on a police officer's exercise of discretion to safeguard the privacy and security of individuals against arbitrary invasions. *People v. Colyar*, 2013 IL 111835, ¶ 31. Ultimately, when assessing the reasonableness of an officer's conduct, due weight is given to reasonable inferences that the officer is permitted to draw from the facts in light of his or her experience, and each case must be decided on its own facts. *Terry*, 392 U.S. at 27; *Colyar*, 2013 IL 111835, ¶¶ 36-37.

¶ 65 On a motion to suppress evidence, the defendant bears the burden of proof and must establish a *prima facie* case that the evidence was obtained from an unlawful search or seizure. 725 ILCS 5/114-12(b) (West 2012); *People v. Brooks*, 2017 IL 121413, ¶ 22. In other words, the defendant bears the burden of establishing the factual and legal bases for the motion to suppress. *Brooks*, 2017 IL 121413, ¶ 22. And where the defendant asserts an illegal search occurred, the defendant must establish both that there was a search and that it was illegal. *Id.* If the defendant meets that initial burden, the burden then shifts to the State to produce evidence justifying the intrusion. 725 ILCS 5/114-12(b) (West 2012); *Brooks*, 2017 IL 121413, ¶ 22. Once the State has introduced evidence supporting the existence of a reasonable, articulable suspicion justifying the warrantless stop, the State's burden of production is satisfied and the burden then returns to the defendant who must ultimately persuade the court that the search was unreasonable. *Brooks*, 2017 IL 121413, ¶ 22. Holmes failed in that burden.

¶ 66 Holmes filed his motion to suppress alleging that police conducted a warrantless search of his person. Given that it was undisputed that police acted without a warrant, that claim shifted to the State the burden of producing evidence demonstrating why the police stopped and frisked Holmes. The State satisfied that burden through Delgado's testimony. After receiving the information from Wilkerson relaying the description of a man in the park with a gun, Delgado and Montes walked through the park and within minutes while still within the park, they saw Holmes, who matched the description. While Montes asked Holmes if they could ask him a few questions, Delgado touched the outside of Holmes's jeans pocket, and immediately felt the trigger and trigger guard of a handgun. Holmes was ordered to the ground, Montes handcuffed him, and Delgado recovered the revolver from his pocket. The encounter lasted less than a minute.

¶ 67 Wilkerson's knowledge as a result of his conversation with the security guard was imputed to Delgado even if Wilkerson never told Delgado where and when the conversation took place or whether the security guard reported actually seeing the gun. See *People v. Stroud*, 392 Ill. App. 3d 776, 805 (2009). Thus, the majority's reliance on any lack of clarity in the transcript on this point is misplaced. The State had a burden of production, not the burden of persuasion, which remained at all times with Holmes. *In re D.L.*, 2017 IL App (1st) 171764, ¶ 16; *People v. Mott*, 389 Ill. App. 3d 539, 542 (2009); *People v. Gaines*, 220 Ill. App. 3d 310, 321 (1991). And once the State identified the nonanonymous source of the information, the State's burden

- 13 -

of production was satisfied. Moreover, because Holmes never argued, much less adduced evidence, that the information relayed by the security guard was stale or that Wilkerson delayed contacting Delgado and Montes after speaking to the security guard, the majority's focus on the lack of this evidence in the record is also misguided.

¶ 68 An eminently experienced and respected trial judge concluded that Holmes failed to sustain his burden to demonstrate that police acted unreasonably in stopping him to determine whether, as reported, he had a gun in his pocket. The trial court properly rejected Holmes's arguments, which focused on whether the unnamed security guard was an anonymous source, a contention that, as a matter of law, is without merit. Indeed, during oral argument here, Holmes's counsel conceded that if the source of the information was the security guard, the police would have been justified in conducting the *Terry* stop. The majority refuses to accept this concession, but we should honor it because, as discussed below, it comports with the law.

¶ 69 The majority relies on *Florida v. J.L.*, 529 U.S. 266, 270-71 (2000), finding that the tip received here was unreliable because the officers did not personally observe Holmes with a gun and it was unknown whether the ultimate source of the tip observed Holmes with a gun while in the park or if the tip was communicated in person to Wilkerson. *J.L.* is not on point. Unlike the unknown and unaccountable tipster in *J.L.*, the security guard here was capable of identification and the tip was communicated to Wilkerson by the guard, who was working within the park. Indeed, the security guard here was not merely a "concerned citizen"; he was an identifiable individual whose presence in the park was specifically to ensure the safety of the event. Accordingly, information from that source about a threat to security is particularly reliable.

¶ 70 All the State had to show in the trial court was that the source of the tip was not anonymous. And plainly the State sustained its burden. The only issue Holmes asked the trial court to decide was whether, if a security guard conveys information to a police officer about a described individual in a public park with a gun, is that enough to give rise to a reasonable, articulable suspicion warranting a *Terry* stop of an individual matching that description. See *In re J.J.*, 183 Ill. App. 3d 381, 388 (1989) (police officer's stop of minor based on information communicated to officer by restaurant security guard who, in turn, had been told by a patron about an individual in the restaurant with a gun did not violate fourth amendment; noting that "immediate action" was required, court stated, "We do not view these facts with analytical hindsight but instead consider them from the perspective of a reasonable officer at the time the situation confronted him.").

¶ 71 All the "unknowns" (*supra* ¶¶ 18, 37) identified by the majority (*e.g.*, the name or a physical description of the security guard, how the information was conveyed, etc.) were part of Holmes's burden once the State identified the security guard as the source of the information. And Holmes made no effort to persuade the trial court that, notwithstanding the identification of the source, the tip was nevertheless unreliable because (1) the security guard did not actually see Holmes with the gun, (2) Wilkerson may not have received the information from the security guard (or someone posing as a security guard) in person, or (3) some third party, who may or may not have had firsthand information, actually told the security guard about Holmes. If Holmes meant to contest the State's identification of the source of the information or the manner in which the information was conveyed, nothing prevented him from subpoenaing Wilkerson to testify at the suppression hearing or from ascertaining the name of the security firm hired by the Chicago Park District and investigating which of its

employees conveyed the information. The party with the ultimate burden of persuasion cannot satisfy that burden by substituting speculation for evidence. *Brooks*, 2017 IL 121413, ¶ 22; 725 ILCS 5/114-12(b) (West 2012) (the defendant bears the burden of proving that the search and seizure were illegal and must provide the judge with evidence on any issue of fact needed to decide the motion to suppress). The majority simply misapprehends both the nature of the State's burden of production and Holmes's ultimate burden of persuasion when it relies on these unknowns to reverse.

¶ 72    I also do not agree with the majority that *People v. Lopez*, 2018 IL App (1st) 153331, is dispositive. This court found the tip in *Lopez* insufficient to establish the required reliability because the tipster informed the police about " 'a DUI driver' " but did not provide any additional information supporting the conclusion that the defendant was driving erratically. *Lopez*, 2018 IL App (1st) 153331, ¶ 21. Unlike *Lopez*, the security guard here communicated additional information by describing Holmes and specifying that he had the gun in his pocket. And as noted, because the security guard communicated the tip to Wilkerson and the guard's identity could be determined, the tip here was not anonymous.

¶ 73    The facts of this case closely resemble those in *In re A.V.*, 336 Ill. App. 3d 140, 141 (2002), where an unnamed individual approached a police vehicle patrolling a park and told the officer that " 'a kid' " was " 'showing off' a gun." The individual described the "kid" and directed the officer to his location. *Id.* As the officer drove in that direction, other unnamed individuals also reported the same information. *Id.* Within one minute, the officer located the individual in the park. *Id.* at 144. The investigatory stop was found lawful because the individuals conveyed the tip in person, and even though their names were unknown, the individuals could be identified and held accountable if they provided false information. *Id.* at 144.

¶ 74    Here, although the security guard's name was not known, his identity was traceable (indeed, more so than the concerned citizens in *A.V.*) and he too could have been held accountable for conveying false information. See *J.J.*, 183 Ill. App. 3d at 387 (investigatory stop based on information relayed to police officers from a security guard who received an in-person citizen tip of someone with a gun was reasonable). Moreover, Delgado and Montes encountered Holmes while he was still within the park and only minutes after receiving the information from Wilkerson. Given the urgent nature of the tip—a man with a gun in a crowded public park—combined with how quickly the officers located Holmes in the park, the circumstances dictate that a short period of time had elapsed from the time the tip was communicated to Wilkerson and Holmes's detention. See also *Miller*, 355 Ill. App. 3d at 903-04 (tip found reliable because the informant would have remained near the scene and his or her identity could have been traced). The possibility the majority indulges in favor of Holmes, the party bearing the burden of persuasion, that Wilkerson may have acted less then instantaneously upon receiving information from a security guard about a man in the crowded park with a gun (*supra* ¶ 52) is contrary to reason and common experience.

¶ 75    Importantly, the result in *A.V.* did not turn on whether the unnamed individual had actually seen or told the police officer he had seen the "kid" with the gun, a circumstance the majority believes is critical to the analysis. And in none of the cases relied on by the majority was the prosecution required to call the ultimate source of the tip to establish personal knowledge of the reported conduct. As long as the tip is not anonymous, the State has no burden to call the source of the tip because the standard on the motion to suppress is reasonable suspicion and a nonanonymous tip reporting criminal conduct is sufficient to give rise to a reasonable

suspicion. See *J.J.*, 183 Ill. App. 3d at 388 ("[T]he fourth amendment does not require a police officer who lacks the precise level of information necessary for probable cause to arrest to simply shrug his shoulders and allow a crime to occur or a criminal to escape." (citing *Williams v. Adams*, 407 U.S. 143, 145 (1972))).

¶ 76   On appeal, Holmes advances an entirely new theory regarding the source of the information. Instead of assuming that the security guard was the "anonymous" source—the position he took in the trial court—he now posits that perhaps an unidentified third party, in person, by telephone (How would that person obtain the security guard's cell phone number?), or shouting out the window of a car while driving by, told the security guard that a described individual was in the park with a gun in his pocket and that the security guard (or an imposter posing as a "security guard") called Wilkerson (Again, how would the security guard, much less an imposter posing as one obtain a police sergeant's cell phone number?) and relayed the information. Based on this speculative scenario, which is decidedly different than the theory Holmes advanced in the trial court, Holmes now argues that because the record does not rule out all possible sources of the information police used to stop him, the State did not succeed in disestablishing the anonymity of the tipster or establishing the reasonable, articulable suspicion necessary to justify the *Terry* stop.

¶ 77   There are two reasons—either equally sufficient—why we should refuse to consider this argument. First, and most obviously, a defendant who has litigated and lost a motion to suppress in the trial court based on one theory cannot be permitted to raise a new theory on appeal. See *People v. Hughes*, 2015 IL 117242, ¶ 46 (a defendant is prohibited from raising new theories on appeal because the State would be deprived of the opportunity to challenge the claims with evidence of its own).

¶ 78   Second, Holmes's new theory overlooks the fact, as discussed above, that even had he raised it in the trial court, the evidence adduced at the suppression hearing regarding the source of the information would have remained sufficient to satisfy the State's burden of production. In other words, once the State presented evidence identifying the source of the tip as emanating from an ascertainable and traceable person—the security guard—the burden would have returned to Holmes to adduce evidence that, in fact, there was a different source of the information.

¶ 79   The most concerning aspect of the majority's rationale is that it is not limited to public parks. If the quantum of evidence law enforcement possessed here to conduct a *Terry* stop of an individual reported to be carrying a weapon in a public park is deemed insufficient, the same result must obtain in all sensitive locations because the statutory prohibition does not distinguish among them. See 720 ILCS 5/24-1(c)(1.5) (West 2012) (an individual is prohibited from possessing a weapon "in any school *** in a public park, in a courthouse"). So we must assume if an unnamed hospital or school security guard or a church congregant reports to police the presence of a described individual with a concealed weapon inside those buildings, police are, without more, powerless to locate, stop, and frisk that person. According to the majority, the police must (i) first take the time to ascertain whether the person reporting the information actually saw the weapon and (ii) if not, determine how the person came to learn that information and, in those precious seconds, hope that the possessor of the firearm does not begin shooting. Under the facts of this case, those options are neither viable nor legally required. The majority does not cite any authority that required the police officers here to disregard a reasonable belief that the safety of the park occupants was in imminent danger.

- 16 -

¶ 80      I cannot adhere to the majority's view of the law. Far from the "all's well that ends well" label that the majority attaches to my rationale for affirming, the police conduct here was not only legally justified, it was imperative. I would affirm Holmes's conviction.